**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LILIA FRIAS,** | ) | |
| | ) | **No. 14 CV 4848** |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant Lilia Frias seeks judicial review under 42 U.S.C. § 405(g) of a final

decision of Defendant Commissioner of the Social Security Administration ("SSA")

denying her claim for Social Security Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act ("the Act").  *See* 42 U.S.C. § 423.  The parties have

consented to the jurisdiction of the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c).  For the reasons that follow, Claimant's motion for summary judgment

is granted and defendant's motion is denied.  The case is remanded for further

proceedings consistent with this opinion.

## I. BACKGROUND

### A.      Procedural History

Claimant filed a T2 DIB application on March 28, 2012 alleging an onset date of

March 3, 2010 due to a back injury, a herniated disc, foot and back pains, and

depression.  (R. 204-07.)  The application was denied initially and upon reconsideration.

(R. 99, 136-38.)  After both denials, Claimant filed a hearing request on August 23, 2012

pursuant to 20 C.F.R. § 404.929 *et seq.*, which was granted, and a hearing was scheduled on February 4, 2013 before an Administrative Law Judge ("ALJ").  (R. 140.) Claimant appeared for her hearing along with her representative.  (*Id.*)  A Vocational Expert ("VE") was also present to offer her testimony. (*Id.*)  On March 3, 2013, the ALJ found Claimant disabled for a closed period of disability starting on March 3, 2010, her alleged onset date, through July 15, 2012.  (R. 27.)  The ALJ determined that Claimant was no longer disabled as of July 16, 2012.  (R. 35-38.)  Claimant brings this action.

## B.    Medical Evidence

### 1.    Treating Physicians

Claimant injured her back on March 3, 2010 while attempting to pull a skid full of carton material at her workplace.  (R. 349.)  She visited MacNeal Hospital on March 5, 2010 because of severe back pains that resulted from the accident.  (R. 424.)  After an evaluation, she was instructed to attend physical therapy and then she was discharged home.  (R. 430, 439.)  Claimant visited the emergency room at Advocate Medical Center on March 7, 2010 because she continued to have lower back pains.  (R. 254-60.)  A physical exam returned normal results and Claimant was prescribed Valium and Oxycodone for her pain.  (R. 255, 259.)  She was discharged home and instructed to follow-up with her primary care physician within two to three days.  (R. 257, 259.)

Soon after her accident at work, Claimant visited Dr. Francisco Espinosa of the Neurological Surgery and Spine Surgery.  (R. 559.)  Dr. Espinosa found that Claimant suffered from a herniated lumbar disc and recommended four weeks of physical therapy.  (R. 561.)  Dr. Espinosa completed a back and neck pain questionnaire on March 10, 2010.  (R. 588-93.)  He noted that Claimant had numbness, tingling, and

weakness in her leg and any movement worsens her symptoms.  (R. 590.)  She can sit and stand for less than one hour, and can walk less than two blocks.  (R. 591.)

Claimant returned to MacNeal on March 8, 2010 for an MRI that showed she had a herniated disc.  (R. 423.)  At this time, Claimant began attending physical therapy at MacNeal, which continued through May 2010.  (R. 440-73.)  She reported progress on some days and continuous pain other days.  (*Id.*)  An MRI was performed on May 10, 2010, which yielded results similar to the March MRI.  (R. 474.)  On June 3, 2010, after her physical therapy sessions failed to improve her condition, Claimant elected a micro-discectomy, a surgery performed to remove a herniate disc.  (R. 483.)  Dr. Espinosa conducted the procedure and reported no complications afterwards.  (R. 483, 582.)

After her surgery, Claimant visited Dr. Espinosa on several occasions. Treatment reports show that her symptoms and pain fluctuated throughout her visits. On June 18, 2010, Dr. Espinosa once again evaluated Claimant and reported that she was doing well but still complained of left-side low back pain.  (R. 603.)  Six weeks after the procedure on July 23, 2010, Claimant reported that she felt an increase in her lower back pain and she rated her pain an eight on a ten-point scale.  (R. 528.)  She started taking Norco, Gabapentin, and Soma for her pain.  (*Id.*)  Two months after the procedure, Dr. Espinosa reported that Claimant did not appear to be in distress and that she was able to walk on her heels and toes.  (R. 515.)  On September 15, 2010, Dr. Espinosa examined Claimant and noted she was in mild distress and walked with a limp due to increased pain.  (R. 610.)  He recommended physical therapy and epidural steroid injections, but Claimant declined the injections.  (*Id.*)  Treatment notes from October 2010 and November 2010 indicate that Claimant's pain persisted and caused

her to stop attending physical therapy. (R. 516, 612.) Dr. Espinosa recommended that Claimant proceed with "redo" procedure of the micro-discectomy to address her back pain and she agreed. (R. 562, 613-14.)

After the micro-discectomy was performed at Adventist Hospital, she was discharged home in stable condition. (R. 321.) However, Dr. Espinosa reported post-surgery that Claimant's back pain did not improve, though her leg pains were remedied. (R. 628.) On May 13, 2011, two and a half months after the "redo" procedure, Claimant continued to complain of lower back pain and rated her pain a six on a ten-point scale. (R. 517.) In July 2011, Claimant continued to report significant pain diffusing through her lower back that worsened with any activity. (R. 626.) She reported a lack of improvement in August 2011 and September 2011. (R. 567, 292.) On September 26, 2011, Claimant received lumbar infusion at Adventist Hospital. (R. 307.) She was given a new prescription of Norco for her pain. (R. 660.) During follow-up visits, Claimant continued to complain of back pain but reported slow improvement since the lumbar fusion. (*Id.* 502, 506, 531.) In April 2012, Claimant reported that strength was improving but she did not foresee returning to work in the immediate future. (R. 668.)

Claimant has been a patient of Dr. Kern Singh M.D., a spinal surgeon at DuPage Hospital, since March 2010. (R. 387-413.) On August 23, 2010, Dr. Singh performed a medical evaluation on Claimant. During the evaluation, Claimant stated that she has lower back pain that she rates five out of a ten-point scale. (R. 387.) The pain radiates from her buttock, thigh, and to her foot and intensifies when she is standing, climbing stairs, bending forward, lying on her back, or turning her head. (*Id.*) Dr. Singh determined that Claimant's pain was causally related to her work-related injury and that

she is not at maximum-level improvement. (R. 389.) He further diagnosed Claimant with recurrent L5-S1 left-sided disc herniation. (*Id.*) Claimant visited Dr. Singh six times in 2011. (R. 395-396.) During an examination on January 31, 2011, Dr. Singh reported that Claimant's pain was rated a three on a ten-point scale but that her leg pain was approximately five on a ten-point scale. (R. 384.) On February 28, 2011, Dr. Singh opined that Claimant would be off work for four weeks, can undergo light work with less than 10 pounds lifting and should attend physical therapy. (R. 939.) On December 5, 2011, Dr. Singh evaluated Claimant and found Claimant able to work full-time but with restrictions in lifting, pushing, pulling, bending, and stooping. (R. 378.)

Claimant had 15 physical therapy sessions at Neurological Surgery and Spine Surgery from June 17, 2011 through August 3, 2011. (R. 534-52.) During the initial evaluation, Claimant complained of back pain that increased since her surgery. (R. 551.) In a discharge summary dated August 3, 2011, Claimant's physical therapist noted that she has not experienced significant relief or improvement in her functioning. (R. 534.) Claimant returned to Neurological for physical therapy on December 21, 2011. (R. 752.) She reported some improvement since her second micro-discectomy but she continued to be in pain. (*Id.*) In a report dated May 16, 2012, Claimant reported continuing lower back pain but her physical therapist reported improvement in her strength and spinal stability. (R. 695.) She was discharged from physical therapy on September 4, 2012 and asked to continue a home exercise program. (R. 675.)

Claimant also attended physical therapy sessions with Accelerated Rehabilitation Center from August 13, 2010 through November 3, 2010. (R. 349-57.) A progress note dated September 2, 2010 indicated that Claimant noticed improvement with her lower

back and has improved her standing and walking tolerance to a maximum of two hours. (R. 351.) At her final therapy session, she increased her mobility and was objectively showing signs and symptoms of plateauing. (R. 357.) Claimant was then referred back to Dr. Espinosa for next steps. (*Id.*)

### 2. Claimant's Testimony

Claimant and her attorney were present at the administrative hearing held on February 4, 2013 and testified as follows. After some initial dispute between the ALJ and Claimant's attorney regarding Claimant's ability to speak English, Claimant testified with the assistance of a Spanish interpreter. (R. 46.) Claimant is married and lives with her husband and three children, aged 11, 19, and 23. (R. 59.) She finished high school in Mexico and has never studied in the United States. (R. 59.) Claimant further testified that she has never taken classes for English and only picked up the English that "she needed to learn." (R. 57.) At her former job, she communicated mostly in Spanish. (R. 58.) When she needs help with her English, her daughter translates for her. (*Id.*)

Claimant stated that she was not working at the time of the hearing. (R. 49.) Claimant last worked at Tara International as a machine operator by title, but performed various responsibilities such as that of a packer and a cleaner. (R. 50.) She would also carry boxes that were frequently 25 pounds but could weigh as much as 40 pounds. (R. 76.) She testified that she worked at Tara for 15 to 20 years. (*Id.*) She stopped working around March 3, 2010, when she injured her back while trying to pull a skid. (R. 61) She initially tried to return to work. (*Id.*) She visited a hospital emergency room but they were unable to control her pain and so they discharged her. (R. 62.) She returned to the hospital emergency room and was given morphine for her pain. (*Id.*)

Claimant further testified that she had three surgeries performed on her back, the most recent being in September 2011.  (*Id.*)  She finished physical therapy in July 2011 but has not returned for more sessions.  (R. 63.)  Claimant testified that a company doctor at Tara cleared her to return to work.  (R. 64.)  However, Claimant further testified that Dr. Espinosa did not allow Claimant to return to work.  (R. 67.)  He told her that she should not lift anything over 15 pounds.  (*Id.*)  Claimant testified that she was no longer seeing Dr. Espinosa because he believed that Claimant should have surgery to correct her back and Claimant did not want to endure another surgery.  (R. 70.)

Claimant testified that after surgery, she felt a slight improvement but she had difficulty moving her feet.  (*Id.*)  She needed the assistance of a cane to walk.  (R. 69.)  Claimant stated that she could stand for a half hour to an hour before the pain emerged in her left foot.  (*Id.*)  She testified that she experiences back pain in extreme temperatures.  (*Id.*)  Whenever she feels pain she takes either Advil or Tylenol.  (R. 70.)  She previously took Norco and Gabapentin to control her pain but testified that her doctor instructed her to stop taking medication and to work on controlling her pain mentally and by resting.  (R. 74.)  She has not taken Norco or Gabapentin for about three months.  (*Id.*)  However, Claimant testified that she continues to take Advil or Tylenol at least six or seven times in a week because of intense pain in her back and in her foot.  (R. 71.)  The pain is caused by standing for a long period of time or doing the dishes.  (*Id.*)  She also experiences pain when sitting for over a half an hour.  (R. 73.)

Claimant testified that she exercises at times to help relieve her pain.  (R. 72.)  As part of her exercise, Claimant walks for about 10 minutes and follows her physical therapy exercises for 20 minutes.  (*Id.*)  She testified that some of the exercises help her

with her pain. (R. 72-73.) After her exercises, she normally showers and rests. At home, her children assist her with the household chores but she will occasionally sweep. (R. 74.) She will sometimes cook for her children. (R. 79.)

### 3. VE Testimony

A VE was present at the hearing and offered the following testimony. She classified Claimant's previous positions with Tara as a machine operator, a cleaner, and a packer, all of which were medium exertion jobs at the unskilled level. (R. 80.) The VE testified that an individual who would be able to lift and carry 20 pounds occasionally and 10 pounds frequently, could stand, walk, and sit six hours in an eight-hour workday, could occasionally climb ramps, stoop, kneel, crouch, and crawl would be unable to perform Claimant's past work. (*Id.*) Based upon Claimant's age, education, and work experience, there are jobs existing in significant numbers in the national economy that Claimant could perform, such as a small parts assembler, a house-keeping cleaner, also a production assembler, all of which are light exertion jobs that are unskilled. (R. 81.) The VE further testified that a housekeeping cleaner position would require less than occasional stooping, and small-parts assembler will vary in the amount of weight that needs to be lifted. (R. 81.) The VE also clarified that the difference between a production assembler and small-parts assembler is based on the products, and the jobs could be on a bench or on an assembly line. (R. 81-82.) If the individual could only stand or walk continuously for up to ten minutes, the individual would be unable to perform the house-keeping responsibilities. (R. 84.) The responsibilities of the small-parts assembler would be reduced, as well as the production assembler, and therefore the number of jobs available would decrease. (*Id.*)

The VE further opined that an individual who could lift or carry up to 15 pounds, could stand, walk, and sit six hours in an eight-hour workday, occasionally climb stairs and ramps, and is limited in performing twisting motions in the waist, would not be able to perform Claimant's previous past jobs. (R. 82.) However, with those restrictions, an individual of Claimant's education, work experience, and age would be able to perform some of the duties of a small-parts assembler, production assembler jobs, cleaner, and polisher. (*Id.*) If the individual had limitations in stooping, the VE believed that he or she would be able to perform the previously mentioned jobs. (R. 83.) If the individual could continuously stand and walk for only 10 minutes, the availability of positions for the cleaner and polisher jobs would be reduced.

Claimant's attorney then asked the VE whether a 44-year-old individual with limited education and English abilities, who took a daily unscheduled break for an hour in addition to the allowable 15 minute breaks, would be employable in the national economy. (R. 86.) The VE testified that the individual would be unable to maintain competitive employment. (*Id.*) The VE further testified that for the previously mentioned jobs, an individual cannot miss more than one day per month in order to remain competitive and employed within the work force. (R. 87.)

### 4. ALJ Determination

On March 8, 2013, the ALJ determined that Claimant was entitled to DIB for a closed period of disability from March 3, 2010 through July 15, 2012. (R. 27-38.) As an initial matter, the ALJ found that Claimant met the insured status requirement of the Act through December 31, 2015 and that she has not engaged in substantial gainful activity ("SGA") since her disability onset date of March 3, 2010. (R. 30.) At step two, the ALJ

determined that within her closed period of disability, Claimant had the severe impairments of degenerative disc disease of the lumbar spine and obesity. (*Id.*) At step three, the ALJ found that Claimant did not have an impairment or a combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 31.) At step four, the ALJ determined that Claimant could not perform her past work within the closed period of disability. (R. 33.) At step five, the ALJ determined there were no jobs in the national economy that Claimant could have performed within the closed period of disability. (R. 34.)

The ALJ also determined, however, that Claimant's disability ended on July 16, 2012. (*Id.*) The ALJ found medical improvement and that Claimant has been able to perform SGA from July 16, 2012 through the date of the ALJ decision. (*Id.*) After the closed period of disability and starting July 16, 2012, the ALJ's decision in step one through four were substantially the same. (R. 35-37.) At step five, the ALJ determined that Claimant had the RFC to perform light work, limited to lifting and carrying 15 pounds, and with limitations in standing, walking continuously for up to one hour, climbing, stooping, kneeling, crouching and crawling. (R. 35.) The ALJ concluded that Claimant could perform jobs existing in significant numbers in the national economy, such as small-parts assembler, production assembler, cleaner, and polisher. (R. 38.)

## II. LEGAL ANALYSIS

### A. Standard of Review

Because the Appeals Council denied review, the ALJ's findings constitute the final decision of the agency. *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994). The findings of the ALJ as to any fact, if supported by substantial evidence, shall be

conclusive.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.

2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner of Social

Security after a hearing under paragraph (1) shall be subject to judicial review as

provided in section 405(g) of this title to the same extent as the Commissioner's final

determinations under section 405 of this title.").  Although the court affords great

deference to the ALJ's determination, it must do more than merely rubber stamp the

ALJ's decision.  *Griffith v. Sullivan*, 916 F.2d 715 (7th Cir. 1990) (citing *Delgado v.

Bowen*, 782 F.2d 79, 82 (7th Cir. 1986)).  In order to affirm the ALJ's decision, the court

must find the decision to be supported by substantial evidence in the record as a whole,

and must take into account whatever in the record fairly detracts from its weight.

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).  Substantial evidence is

more than a mere scintilla; it is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  *Kepple v. Massanari,* 268 F.3d 513 (7th

Cir. 2001) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

    In addition, the court may not displace the ALJ's judgment by reconsidering facts

or evidence or making credibility determinations.  *Skinner v. Astrue*, 478 F.3d 836, 841

(7th Cir. 2007).  Where conflicting evidence allows reasonable minds to differ as to

whether a claimant is disabled, the responsibility for that determination falls upon the

ALJ, not the courts.  *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).  An ALJ must

articulate her analysis by building an accurate and logical bridge from the evidence to

her conclusions, so that the court may afford the claimant meaningful review of the

ALJ's ultimate findings.  *Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013).  It is not enough

that the record contains evidence to support the ALJ's decision, and the court must

remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision, so as to prevent meaningful review. (*Id.*)

**B.     Analysis under the Social Security Act**

To qualify for disability benefits, a claimant must be under a disability within the meaning of the Act. *See* 42 U.S.C. § 423(a)(1)(E). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217–22 (2002). Pursuant to the Act, Claimant is disabled only if her physical or mental impairments are of such severity that she is unable to do her previous work and cannot, when "considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work." 42 U.S.C. § 423(d)(2)(A). Another agency requirement to receive disability benefits is that Claimant must show she was disabled on or before the date her insured status expired. *See* 20 C.F.R. § 404.130 for definition of insured status; *Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether Claimant is disabled. *See* 20 C.F.R. § 404.1520(a). This five-step sequential evaluation process requires the ALJ to inquire:

1.     Is Claimant presently engaging SGA? *See* 20 C.F.R. § 404.1572 *et seq.*

2.     Does Claimant have a severe medically determinable physical or mental impairment that interferes with work and is expected to last at least 12 months?

3.     Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?  *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.     Is Claimant unable to perform her former occupation?

5.     Is Claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).  A negative answer at any point, other than step three, ends the inquiry and leads to a determination that Claimant is not disabled.  *Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985).  Claimant has the burden of establishing steps one through four.  At step five the burden shifts to the Commissioner to establish that Claimant is capable of performing work.  *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### III.  DISCUSSION

Claimant asserts that the sufficiency of the ALJ's decision depends on whether she properly evaluated Claimant's credibility for the period following July 15, 2012 and therefore only challenges the ALJ's credibility determination.  To support her argument, Claimant principally argues that the ALJ erred because she grounded her credibility assessment on: (1) Claimant's inconsistent statements; (2) Claimant's lack of treatment since 2012; (3) Claimant's medication regimen; (4) Claimant's decision to forego work conditioning; and (5) Dr. Espinosa's medical opinion.

With regard to credibility, because the ALJ is in the best position to determine a witness's truthfulness and forthrightness, the court will not overturn an ALJ's credibility determination unless it is "patently wrong."  *Shideler v. Astrue*, 688 F.3d 306, 310-11

(7th Cir. 2012).  The court has greater freedom to review credibility determinations when they are based on objective factors rather than subjective observations.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005).  In determining the credibility of a claimant, SSR 96–7p instructs the ALJ to "consider the entire case record" and requires a credibility determination to "contain specific reasons for the finding on credibility, supported by the evidence in the case record[.]"  SSR 96–7p, 1996 WL 374186 at *4; *Schreiber v. Colvin*, 519 F. App'x 951, 960 (7th Cir. 2013).  An ALJ should consider elements such as "objective medical evidence of the impairments, the daily activities, allegations of pain and aggravating factors, functional limitations, and treatment (including medication)."  *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006).

The ALJ must also give specific reasons for the weight given to the individual's statements.  *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).  "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible."  *See* SSR 96–7p * 4 (S.S.A.) 1996 WL 374186; *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)(the ALJ must explain her decision in such a way that allows the court to determine whether she reached her decision in a rational manner, logically based on specific findings and the evidence in the record.)

A.    **Inconsistent Statements**

Claimant first argues that the ALJ erred by basing her adverse credibility determination on Claimant's inconsistent statements regarding her daily activities. Claimant refers to the ALJ's statement that "[C]laimant's allegations at the hearing

conflict with her earlier statements and with the medical record…[C]laimant alleged…that she cannot clean except [sweep] but on her function report she reports being able to wash dishes and clean the kitchen." (R. 37.) Though the ALJ may consider such activities when assessing credibility, *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007), she must explain perceived inconsistencies between Claimant's activities and the medical evidence. *See Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *see also Tiemann v. Barnhart*, 152 F. App'x 540, 542 (7th Cir. 2005) (according to the ALJ, in addition to her daily activities, objective medical evidence including examination results, x-rays, and MRIs, suggested that the claimant was exaggerating her pain, as did her choice not to see a doctor for several months); *Schreiber*, 519 F. App'x 951 at 961 (the ALJ specified several valid reasons for finding the claimant not credible, including the discrepancy between her complaints of significant side effects from her medication in her hearing testimony, the lack of evidence regarding those symptoms in the treatment notes from her visits to her doctor, and the inconsistencies between her allegations with the evaluations of [her] examining psychologist and reviewing psychologists, as well as with the level of treatment she received).

Here, the ALJ concluded that Claimant's testimony ran counter to the medical evidence and her previous statements on her function report because "[C]laimant alleged at the hearing that she cannot clean except sweeping but on her function report she reports being able to wash dishes and clean the kitchen." (R. 37.) But this view of her daily activities improperly and inextricably ignored other portions of her function report that speak to the many breaks she took and the amount of time she required to

complete such activities. She reported that it generally "[took] about three hours with breaks in between" and that her "oldest daughter and son help[ed] a lot…they do laundry, clean…" (R. 222-23.) The ALJ failed to recognize that a person who needs to spend much of the day lying down cannot work, and that unlike full-time work, the activities of daily living can be flexibly scheduled. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ([the Seventh Circuit] has repeatedly emphasized that an ALJ should consider a claimant's limitations in performing household activities and cautioned "that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *see Hamilton v. Colvin*, 525 F. App'x 433, 438 (7th Cir. 2013) (citing *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013)); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

The ALJ also failed to analyze the factors required under the Act when considering her functionality. Although she briefly described Claimant's testimony about her daily activities, she did not, for example, explain whether her daily activities were consistent or inconsistent with the pain and limitations she claimed. The ALJ simply concluded that because Claimant swept and reportedly cleaned the kitchen, her back pain allegations were incredible and she was capable of light work. But in doing so, the ALJ improperly equated Claimant's household chores to her ability to obtain employment, which the Seventh Circuit has previously admonished. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). As such, the ALJ failed to build a logical bridge from the evidence to her

conclusion that Claimant was not credible.  *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

The ALJ also found Claimant's report of her last visit to Dr. Espinosa inconsistent with his treatment notes.  Here, the Commissioner argues that the ALJ reasonably relied on the treatment notes in her credibility determination.  Claimant testified during the hearing that she was no longer seeing Dr. Espinosa because he advised her to either have another surgical procedure performed or "live with the pain."  (R. 70.)  The ALJ thought this inconsistent with the treatment notes from her final visit to Dr. Espinosa in which he remarked that Claimant may return to working in a sedentary or light position with limitations in lifting items over 15 pounds.  (R. 37, 782.)  There are several issues that complicate the ALJ's reasoning.  First, it is clear that the hearing was complicated by the language barrier and Claimant required the assistance of a Spanish interpreter to communicate with the ALJ.  She also had trouble remembering details, and the record is fraught with instances in which Claimant could not understand the ALJ's questions, did not remember dates, or recall the answer to questions posed by the ALJ.  (R. 62, 63, 64, 66, 67, 69, 71.)  In addition, the ALJ referred only to Dr. Espinosa's treatment notes from June 2012 in which he opined that Claimant may return to sedentary to light work.  But she does not explain how she came to this conclusion when only a month prior, on May 18, 2012, Dr. Espinosa remarked that Claimant was "incapacitated and unable to work."  To survive remand, the ALJ must support her credibility determination with substantial evidence from the record, s*ee Carradine v. Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004), but these issues combine to

undermine the ALJ's credibility determination.  *See Shideler*, 688 F.3d 306 at 311 *citing Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

By only considering Dr. Espinosa's treatment notes from Claimant's last visit, the ALJ neglected a whole line of evidence that documented Claimant's back pains and she therefore impermissibly cherry-picked facts that supported her findings.  *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)).  Dr. Espinosa opined in a letter dated May 18, 2012 that Claimant required her medication on a long-term basis to manage her pain and that she should consider the possibility of a spinal cord stimulator, (R. 671), but the ALJ's decision did not mention this aspect of his medical opinion.  The Seventh Circuit has discussed the improbability that a claimant would undergo pain-treatment procedures, such as heavy doses of strong drugs and a surgical implantation in her spine of a spinal-cord stimulator "merely to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits."  *Carradine*, 360 F.3d 751 at 755.  Because the ALJ did not fulfill her obligation to consider the entire case record and give specific reasons for her determination, her adverse credibility determination was not grounded on substantial evidence.  *See Minnick v. Colvin*, 775 F.3d 929, 936 (7th Cir. 2015); *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (an ALJ must explain an adverse-credibility finding with specific reasons).

**B.  Lack of Treatment**

Claimant next argues that the ALJ improperly relied on her lack of treatment since June 2012 when assessing her credibility.  Here, the ALJ found that Claimant did not receive any further medical treatment from Dr. Espinosa or any other provider, apart

from several sessions of physical therapy which concluded in September 2012. The Commissioner argues that the ALJ reasonably considered the lack of medical treatment in evaluating credibility but the court is not persuaded. In assessing credibility, infrequent treatment can support an adverse credibility finding where the claimant does not have a good reason for the infrequency, *see* SSR 96-7P *8 (S.S.A.), 1996 WL 374186, but the ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care. *Id*; *see also Craft v. Astru*e, 539 F.3d 668, 679 (7th Cir. 2008); *Moss*, 555 F.3d 556 at 562. After finding Claimant not credible, the ALJ did not seek out the reasons for Claimant's lack of medical treatment subsequent to her visit with Dr. Espinosa in June 2012. An ALJ may need to "question the individual at the proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." *See* S.S.R. 96–7p, 1996 WL 374186, at * 7. Because the ALJ did not pursue this line of inquiry, her credibility determination is deficient.

Nor did she reference the part of Dr. Espinosa's treatment notes where he opined that no further treatment would be recommended beyond the implantation of a spinal cord pain stimulator, which Claimant declined to do. A potential reason for a claimant's sporadic treatment is that "the individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual," *see* S.S.R. 96-7p * 7 (S.S.A.), 1996 WL 374186, which appears to be the case here. Though the ALJ focused on Claimant reaching her "maximum medical improvement," she did not further explore Dr.

Espinosa's evaluation. In his treatment notes, he suggested that Claimant continue with her physical therapy and taper down her use of Norco and Gabapentin. (R. 782.) Dr. Espinosa did not set any future appointments with Claimant but he left open the possibility that she could have "concerns" that "arise" and suggested that she see him when they do. (*Id.*) The ALJ interpreted his statement to mean that Claimant has fully improved since July 2012, but there may have been a reasonable explanation behind Claimant's decision to not pursue surgery or further treatment, such as she may not have been able to afford the treatment, further treatment would have been ineffective, or the treatment created intolerable side effects. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Because the ALJ did not ask important questions to determine if Claimant's actions were justifiable, the court cannot assess the validity of the ALJ's credibility determination. *See Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014).

## C.    Medication Regimen

Claimant next argues that the ALJ improperly found her not credible because she "only takes prescription pain medication during her period, which aggravates her back." Pl. Mot. at 11. Though Claimant's failure to take her prescribed medication lends some support to the ALJ's credibility determination where she does not have a good reason for the failure, *see Craft*, 539 F.3d 668 at 679, once again, the ALJ must not draw any negative inferences about a claimant's condition unless the ALJ has explored the claimant's explanations as to the lack of medical care or failure to follow a medication regimen. *Id.* An ALJ must explore elements such as "objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and aggravating factors,

functional limitations, and treatment." *See Schreiber,* 519 F. App'x 951 at 960 (*citing Prochaska*, 454 F.3d at 738).

As with her previous argument regarding her lack of medical care after July 2012, the ALJ's credibility determination was improper since "a failure to pursue treatment cannot be a sound basis for the ALJ's adverse credibility finding." *Ribaudo v. Barnhart*, 458 F.3d 580, 585 (7th Cir. 2006.) It is especially inappropriate here since Claimant offered a variety of reasons for why she limited her intake of her pain medications, Norco and Gabapentin at her hearing. First, she testified before the ALJ that Dr. Espinosa advised her to taper off on her medication because they can cause serious harm to the liver. (R. 70.) She also testified that the medication would impair her memory and that she had difficulty taking her medication because "[she] would take the pills and [she] wouldn't remember if [she took] them or not." (R. 67.) Furthermore, Dr. Espinosa's treatment notes from April 6, 2012 indicated that Claimant's insurance had stopped approving her medication. (R. 505.) Dr. Espinosa suggested that Claimant taper off her medication because she cannot abruptly stop her medication intake or else she would suffer from seizures and other withdrawal symptoms. (*Id.*)

Though the ALJ questioned Claimant about her medication during the hearing, she did not consider these reasons in her credibility determination. All of these factors suggest that Claimant had reasonable justification for limiting her medication intake but the ALJ prematurely discredited her. Although the ALJ need not discuss every piece of evidence in the record, she must confront the evidence that does not support her conclusion and explain why it was rejected. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Here, the ALJ impermissibly "played doctor" and reached an

independent medical conclusion about Claimant's medical improvement simply because she no longer took her medication. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Halsell v. Astrue*, 357 F. App'x 717, 722 (7th Cir. 2009).

**D.    Work Conditioning**

Claimant further asserts that the ALJ erred when she discounted Claimant's credibility because she elected not to pursue work conditioning though Dr. Espinosa advised it. However, the ALJ misunderstood Dr. Espinosa's meaning because he only suggested that she pursue work conditioning if she chose to return to work, which Claimant did not. In fact, he noted that "[Claimant] states that she does not plan to return to her previous occupation, so we therefore do not recommend that she attend work conditioning." (R. 782.) While it is true that an ALJ may consider a claimant's work experience in making a credibility determination, and ALJ's have used a spotty work history to conclude that a claimant lacked the incentive to return to work, *see* SSR 96-7P *5 (S.S.A.), 1996 WL 374186; *Buchholtz v. Barnhart*, 98 F. App'x 540, 545 (7th Cir. 2004), the ALJ's reliance on Claimant's "unwillingness" to return to work was improper here. Dr. Espinosa's treatment notes during Claimant's final session indicated that Claimant did not intend to return to her *previous* occupation at Tara, which involved heavy lifting and scrubbing. (R. 782.)

It was also improper for the ALJ to render an adverse credibility determination against Claimant based upon what the ALJ perceived to be a reluctance to return to work. Claimant's work history indicates that she has been working consistently since 2003 and only stopped engaging in SGA in 2010, the year in which she became

disabled. (R. 198.) Claimant's work history therefore appears to support her allegations, rather than undermine them.

**E. Dr. Espinosa's Medical Opinion**

Finally, Claimant argues that the ALJ erred when she determined that Claimant's medical improvement allowed her to perform full-time competitive work. In so finding, the ALJ relied primarily on the portion of Dr. Espinosa's treatment notes in which he opined that Claimant would be capable of returning to work in sedentary or light positions with certain restrictions. However, an ALJ must substantiate her credibility findings with specific and logical reasons, based on the record as a whole, *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488–89 (7th Cir. 2007); *Brihn v. Astrue*, 332 F. App'x 329, 333 (7th Cir. 2009). The ALJ should also consider such factors as objective medical evidence, the claimant's daily activities, the claimant's treatment history, and the type, dosage, and side effects of any medications, *see* 20 C.F.R. § 404.1529(c), and it is unclear whether the ALJ did so here. As stated previously, the ALJ ignored Dr. Espinosa's treatment notes from April 2012, where he opined that she should gradually start working but on a part-time basis so that she may maintain her time with physical therapy. (R. 670.) In May 2012, Dr. Espinosa continued to emphasize the need for Claimant to remain in physical therapy and opined that she was unable to work due to continuing pain. (R. 671.) Because of her leg pains, Claimant would need long-term medication treatment. (*Id.*) The ALJ relied on mere portions of Dr. Espinosa's treatment notes rather than consider the medical evidence as a whole. Based upon the flaws in the ALJ's credibility determination, remand is required.

As an additional matter, on remand, the ALJ should address the issue of Claimant's medical improvement.  The parties agree that Claimant was disabled from March 3, 2010 through July 15, 2012 but there is disagreement as to whether Claimant's medical condition improved as of July 16, 2012.  Though Claimant's argument focused on the ALJ's credibility determination, the ALJ should address the errors in her determination regarding Claimant's medical improvement.

Before limiting benefits to a closed period, the ALJ must conclude that a claimant experienced "medical improvement" as evidenced by changes in the symptoms, signs, or test results associated with her impairments, or else that an exception to this rule applies.  See 20 C.F.R. § 404.1594(a), (b)(1); *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011) (*citing Johnson v. Apfel*, 191 F.3d 770, 773 (7th Cir. 1999)).  From the ALJ's decision, it is unclear whether she carried out the sequential eight-step process required by the regulations when determining medical improvement.  *See Blevins v. Astrue*, 451 F. App'x 583, 584 (7th Cir. 2011).  Her cursory analysis of Claimant's improvement was limited to conclusions such as "medical improvement occurred as of July 16, 2012" and that "the improvement is related to the ability to work because of an increase in Claimant's RFC."  This was insufficient.

The Commissioner asserts that remand is unnecessary because substantial evidence supports the ALJ's conclusion that she had experienced medical improvement by July 2012 and thus was no longer disabled.  Medical improvement, as defined in 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i), is "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled.  A determination that there

has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *See Mulligan v. Astrue*, 336 F. App'x 571, 577 (7th Cir. 2009). The court requires, moreover, that an ALJ substantiate her assessment of a claimant's RFC, *see Stewart*, 561 F.3d 679 at 684, and build an accurate and logical bridge from the evidence to the conclusion. *See Clifford*, 227 F.3d 863 at 872.

As previously mentioned, the ALJ in this case inferred medical improvement solely from Dr. Espinosa's treatment notes from her single visit in June 2012, rather than the entire case record. The ALJ provided no analysis of the medical evidence leading up to the final visit and simply remarked that Claimant reported her pain improved and that Dr. Espinosa found her able to return to light work as of July 16, 2012. At the hearing however, Claimant testified that her back pain had not improved and that she did not return to Dr. Espinosa because he only suggested further surgery or that she "live with the pain." The ALJ's conclusory statement to the contrary does not support a finding of medical improvement. *See Tumminaro*, 671 F.3d 629 at 634-35.

Furthermore, Dr. Espinosa's opinion in his final treatment notes is more equivocal than the ALJ suggests. Though the ALJ based her adverse credibility determination on the fact that she declined to return to work and denied work conditioning, Dr. Espinosa wrote, "[Claimant] does not plan to return to her previous occupation, so we therefore do not recommend that she attend work conditioning." What is more, Dr. Espinosa's May 2012 letter—which, again, the ALJ neglected to mention—indicated that Claimant is incapacitated and unable to return to work due to her pain. Her physical therapist opined in April 5, 2012 that Claimant had been to 31

sessions but continued to experience pain in her lower back ranging from four to eight on a ten-point scale. (R. 711.) On May 16, 2012. the physical therapist opined that Claimant was "still complaining of low back pain." (R. 695.) Because the evidence suggests that Claimant's medical condition may not have improved in July 2012, on remand the ALJ should further develop Claimant's complete medical history and obtain additional evidence after July 2012, if necessary. *See* 20 C.F.R. 404.1527(c)(3).

## IV.    CONCLUSION

For the aforementioned reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. The case is remanded for further proceedings consistent with this opinion.


**ENTERED:**

**Michael T. Mason**
**United States Magistrate Judge**

**Dated: February 26, 2016**